## Toler et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued November 14, 1957.   Before RHODES, P. J.,
HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WAT-
KINS, JJ.

*C. Francis Fisher,* with him *Brenlove & Fisher,* for
appellants.

*Edward Munce,* Assistant Counsel, with him *Jack F. Aschinger,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

*David Dunlap,* with him *Edward J. Cooke,* for utility company, intervening appellee.

OPINION BY WRIGHT, J., January 21, 1958:

The Pennsylvania Power Company, hereinafter referred to as the Company, is a public utility corporation engaged in the business of generating electric power, heat, and light for public use in the counties of Allegheny, Beaver, Butler, Lawrence, and Mercer. Under the provisions of the Act of 1921, P. L. 1057, 15 P.S. 1182, the Company applied to the Pennsylvania Public Utility Commission, hereinafter referred to as the Commission, for approval of the exercise of the right of eminent domain in acquiring lands of Elizabeth N. Toler and Earl W. McComas in Taylor Township, Lawrence County, "for the purpose of storing ash thereon and for the practical development of its other ash storage areas". The property owners filed in the Court of Common Pleas of Dauphin County a complaint for an injunction questioning the jurisdiction of the Commission on the ground that the Act of 1921 does not confer the right to acquire land for the purpose indicated. The Company was permitted to intervene, and both the Company and the Commission filed answers to the complaint. After the taking of testimony and the submission of requests for findings of fact and conclusions of law, the chancellor filed an adjudication with decree nisi dismissing the complaint. Exceptions filed by the property owners were dismissed by the court en banc, and the decree nisi was affirmed and

adopted as the final decree. The property owners have appealed.

Under Section 1111 of the Public Utility Law,[1] the Court of Common Pleas of Dauphin County is expressly clothed with exclusive jurisdiction throughout the Commonwealth of all injunction proceedings questioning the jurisdiction of the Commission. See *Reed v. Pa. P. U. C.*, 174 Pa. Superior Ct. 132, 100 A. 2d 399. By virtue of the Act of 1921, the Company is authorized "(b) To appropriate property . . . necessary for its corporate use in the construction, erection, operation, or maintenance of its buildings, machinery, apparatus, plants, works, equipment, and facilities for generating electric light, heat, and power, or any of them, for the transmission or distribution thereof . . . And provided further, That before any such company shall exercise the power conferred by this subsection, the Public Service [Utility] Commission of the Commonwealth of Pennsylvania, upon application of such company, shall have found and determined, after public hearing, that the service to be furnished by said company through the exercise of said power is necessary or proper for the service, accommodation, convenience, or safety of the public". Appellants take the position that the storage of ash or residue from the operation of the Company's generating plant is not necessary or proper for the service, accommodation, convenience, or safety of the public. On the other hand, the position of the Company and the Commission is that the storage of ash is an integral part of the Company's electric-power generating activity, and that, by necessary implication, the Act of 1921 does confer the power of eminent domain for such purpose.

The Company's sole generating facility is its West Pittsburgh plant, located about four miles south of

---

[1] Act of 1937, P. L. 1053, Section 1111, 66 P.S. 1441.

New Castle. There are presently in operation at said plant three units with a total of 173,000 kilowatt capability. A new unit with a 90,000 kilowatt capability is to be placed in operation during the summer of 1958. The plant uses pulverized coal as a fuel to create steam. The coal is blown by air under high pressure into the boiler, where additional air is added to support combustion. As a result, the water in the boiler is heated and steam is generated. After passing through a superheater, the steam is conveyed by pipe to the turbine where it is forced through the nozzle block at high velocity causing the turbine paddle wheels to revolve. The turbine then drives the generator which produces the electricity. A certain amount of ash from the coal falls in a molten state into the ash hopper at the bottom of the boiler. The finer particles, termed fly ash, are carried through the boiler into a dust collector. The fly ash is then mixed with water and flows out by gravity into the disposal area, which is arranged like a large basin. The ash in the hopper is sluiced to a pump and also discharged into the disposal area. The ashes then settle, and the water is drained by weirs or "weeps" into the Beaver River so that the ashes eventually fill the basin.

The Company is required, under state and federal regulations prescribing a uniform system of accounts applicable to an electric utility, to classify plant items according to the functions performed. The pertinent accounts established by the Commission under the heading "Steam Production" are set forth in the footnote.[2]

—————

[2] "Account 310, Land and Land Rights: This account shall include the cost of land and land rights employed in connection with steam generation.

"Account 312, Boiler Plant Equipment: This account shall include the cost installed of all furnaces, boilers, coal and ash handling and coal preparing equipment, steam and feed water piping.

An expert witness testified that it was not possible to operate the plant without disposing of the ash, that the handling of the ash was a necessary part of the plant facilities and operation, and that it was not possible to dispose of the ash output of the plant except by use of the land designated. It should be here noted that the Company presently stores ash from the plant on its adjoining land, and also owns other land which can be satisfactorily and economically used for ash storage only if the Company acquires the intervening tract owned by appellants.

The chancellor made the following findings of fact: "1. In generating electricity by means of steam created by burning coal, ashes are a refuse. It is convenient and economical for the company if the refuse can be dumped near the plant. 2. Facilities used for disposal of ashes produced at a generating station are an integral part of '. . . plants, works, equipment and facilities for generating electric light, heat and power . . .' 3. Operation and maintenance of facilities used for disposal of ashes produced at a generating station are an integral part of the operation and maintenance of '. . . buildings, machinery, apparatus, plants, works, equipment, and facilities for generating electric light, heat, and power . . .'" The chancellor made the following conclusions of law: "1. The Act of May 21, 1921 . . . grants to an electric company the right and power to appropriate land for use in constructing, erecting, op-

---

boiler apparatus and accessories used in the production of steam, mercury or other vapor to be used primarily for generating electricity.

"Subitem 1: Ash handling equipment, including hoppers, gates, cars, conveyors, hoists, sluicing equipment, including pumps and motors, sluicing water pipes and fittings, sluicing trenches and accessories and so forth, except sluices which are a part of a building".

erating, or maintaining buildings, machinery, apparatus, plants, works, equipment, and facilities for disposal of ashes produced at a generating station. 2. The Pennsylvania Public Utility Commission has jurisdiction to hear and preliminarily approve the application of the Pennsylvania Power Company for permission to exercise the right of eminent domain in acquiring the plaintiffs' land".

Appellants first contend that a statute conferring the right of eminent domain on a private corporation should be strictly construed. Appellees agree with this proposition, and we are satisfied that it sets forth a well-settled rule of construction in Pennsylvania. See Section 58 of the Statutory Construction Act of 1937, P. L. 1019, 46 P.S. 558; *Lance's Appeal*, 55 Pa. 16; *Pagni v. Commonwealth*, 179 Pa. Superior Ct. 213, 116 A. 2d 294. However, the judicial interpretation of the term "public use" in our state has not been circumscribed by mere legalistic formulas or philological standards: *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 200 A. 834.[3] The Act of 1921 provides for the appropriation of property necessary for the Company's corporate use. We have heretofore set forth in some detail the method used by the Company in the production of electricity because it fully justifies the conclusion that the storage and disposal of the by-product of the combustion, namely, the ash and fly ash, in the manner outlined is a necessary part of the operation. A case which is somewhat comparable is *Wilson v. Pittsburgh and Lake Erie R. R. Co.*, 222 Pa. 541, 72 A. 235, wherein it was held that the taking of land for the purpose of erecting and maintaining a

---

[3] And see *Ohio Power Co. v. Deist*, 154 Ohio St. 473, 96 N.E. 2d 771, wherein it was held that the construction of a statute delegating authority to exercise the right of eminent domain must not be so strict as to be unreasonable or strained.

water tank was authorized under a statute granting the power to condemn land to straighten, widen and otherwise improve railroad lines. Appellants cite *Pennsylvania Telephone Co. v. Hoover*, 209 Pa. 555, 58 A. 922, wherein it was held that a statute authorizing the construction of lines along "public" roads, streets, land or highways, did not authorize the appropriation of private land. That case has no application in the instant situation.

Appellants next contend that the chancellor accepted irrelevant, immaterial, and incompetent testimony over objection. They argue first that the question involved was one solely of law, and that no testimony was required to assist in the interpretation of the statute because the right of eminent domain must be plainly set forth; and second, that the Company resolution referred to ash storage whereas the witnesses and the chancellor speak of ash disposal. So far as the first argument is concerned, it should be noted that appellants submitted twelve requests for findings of fact. In any event, the statute is couched in generic rather than specific terms and is not self-interpreting. It can be applied to a particular case only when the facts of that case are known. It seems to us that a description of the plant, including an explanation of the processes used in its operation, was not only relevant but essential. The second argument impresses us as mere semantics. The appearance of the by-product of the combustion is a "shiny slurry of ash and water". The disposal and storage thereof are part of the same process. An examination of the record indicates that the words "storage" and "disposal" were used and understood as equivalent terms.

We deem it unnecessary to discuss appellants' remaining contentions. The case at bar was patiently heard and thoroughly considered by an able jurist. His

adjudication was approved by the court en banc. We have concluded that the issue between the parties was properly resolved, and find no reason to disturb the determination of the matter by the court below.

Decree affirmed.